**No. 26-1945**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

CARLTON WRIGHT

*Plaintiff-Cross-Appellant-Appellee*,

v.

SHANE NELSON, ET AL.

*Defendants-Appellants-Cross-Appellees*.

On Appeal from the United States District Court
for the Southern District of Indiana
1:23-cv-459
Honorable Tanya Walton Pratt

---

# APPELLEE AND CROSS-APELLANT'S ANSWERING AND CROSS-OPENING BRIEF

---

Samuel Weiss
RIGHTS BEHIND BARS
1800 M Street NW, FNT 1
#33821
Washington, DC 20033
(202) 455-4399
sam@rightsbehindbars.org

## DISCLOSURE STATEMENT

Appellate Court No: 26-1945
Short Caption: *Wright v. Nelson, et al.*

1. The full name of every party that the attorney represents in the case:

   Carlton Wright

2. The names of all law firms whose partners or associates have appeared for the party in the case:

   Not applicable.

3. If the party, amicus or intervenor is a corporation:
   a. Identify all its parent corporations, if any:

      Not applicable.

   b. list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      Not applicable.

4. Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases

   Not applicable.

5. Provide Debtor information required by FRAP 26.1(c) 1 & 2:

   Not applicable.

Dated: August 28, 2026

*/s/ Samuel Weiss*
Samuel Weiss
Rights Behind Bars
1800 M Street NW, Front 1
#33821
Washington, DC 20033
*Attorney for Carlton Wright*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT .......... ii
TABLE OF CONTENTS .......... iii
TABLE OF AUTHORITIES .......... iv
JURISDICTIONAL STATEMENT .......... 1
STATEMENT OF THE ISSUES .......... 1
STATEMENT OF THE CASE .......... 2
a) Factual history .......... 2
1) The Dorsey assault .......... 2
2) The Brooks assault .......... 5
3) Retaliation .......... 6
b) Procedural history .......... 7
SUMMARY OF THE ARGUMENT .......... 8
ARGUMENT .......... 9
I. This Court Should Reject Defendants' Challenges to the District Court's Order. .......... 9
II. The District Court Applied the Incorrect Law on Compensatory Damages and Undercompensated Wright as a Result. .......... 15
III. The District Court Erred in Failing to Provide Punitive Damages Based on Legal Errors. .......... 20
IV. The District Court Erred in Granting Judgment to Nelson on Wright's Retaliation Claim for Being Kept in Segregation. .......... 22
CONCLUSION .......... 26
CERTIFICATE OF SERVICE .......... 28
CERTIFICATE OF COMPLIANCE .......... 29

# TABLE OF AUTHORITIES

## Cases

*Adams v. City of Chicago*, 798 F.3d 539 (7th Cir. 2015) .......... 16
*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985) .......... 10, 11, 24
*Arpin v. United States*, 521 F.3d 769 (7th Cir. 2008) .......... 16, 17
*Bolden v. Pesavento*, 158 F.4th 879 (7th Cir. 2025) .......... 19
*Carey v. Piphus*, 435 U.S. 247 (1978) .......... 17
*Drake v. United States*, No. 1:13-cv-961-TWP-DML (S.D. Ind.) .......... 17, 18
*Farnik v. City of Chicago*, 1 F.4th 535 (7th Cir. 2021) .......... 19
*Gavoni v. Dobbs House, Inc.*, 164 F.3d 1071 (7th Cir. 1999) .......... 19
*Gevas v. McLaughlin*, 798 F.3d 475 (7th Cir. 2015) .......... 15
*Hendrickson v. Cooper*, 589 F.3d 887 (7th Cir. 2009) .......... 17
*Khouri v. Highland Park CVS, LLC*, 178 F.4th 391 (7th Cir. 2026) .......... 14
*Koon v. United States*, 518 U.S. 81 (1996) .......... 20
*Manuel v. Nalley*, 966 F.3d 678 (7th Cir. 2020) .......... 25
*Mucha v. King*, 792 F.2d 602 (7th Cir. 1986) .......... 10
*Smith v. Wade*, 461 U.S. 30 (1983) .......... 20, 21, 22

## Constitutional Provisions

U.S. Const. amend. I .......... passim
U.S. Const. amend. VIII .......... passim

## Statutes

28 U.S.C. § 1291 .......... 1
28 U.S.C. § 1331 .......... 1
42 U.S.C. § 1983 .......... 1

## Rules

Fed. R. Civ. P. 52(a) .......... 16, 20, 21

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Wright's claims arise from the Eighth Amendment to the U.S. Constitution, First Amendment, and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on March 30, 2026. R. 137. Both parties timely appealed. R. 138; R. 143.

## STATEMENT OF THE ISSUES

I. Whether this Court should reject Defendants' attempts to reweigh the evidence before the district court.

II. Whether the district court erred when it misstated the law governing compensatory damages and then under-compensated Wright as a result.

III. Whether the district court erred when it failed to provide Wright punitive damages based on a misunderstanding of the law.

IV. Whether the district court erred when it granted Nelson summary judgment on Wright's retaliation claim for being kept in segregation based on a misreading of the record.

## STATEMENT OF THE CASE

This is an appeal and cross-appeal from a bench trial held on February 17, 2026. Critical to the court's ruling was that "Defendants Nelson, Sgt. Lee, and Captain Gard, appeared to be woefully unprepared." R. 136 at 9. "Each repeatedly testified" that they did not remember the incidents in this case "despite the existence of exhibits and reports which could have refreshed their memories concerning the claims against them." *Id.* This case presented "numerous disputes in the testimonies of witnesses" which "present[ed] straightforward credibility questions for the Court to resolve as the finder of fact." *Id.* Both the failure of Defendants' witnesses to recall the incidents of this case and their "demeanor at trial … diminished their credibility." *Id.*

*a) Factual history*

1) The Dorsey assault

In November 2020, Shane Nelson recommended that Carlton Wright move to "protective custody" in the annex of M-Unit New Castle Correctional Facility (NCCF) for his own safety. R. 136 at 2. Other prisoners at NCCF considered Wright a "snitch," and he had received threats. *Id.* Shortly after his arrival in the unit, Wright began to have a contentious relationship with his case manager Jama Jones and then, as a result, with Nelson as well. *Id.* at 3. Nelson and Jones began moving Wright's

cell constantly, five times in the first three months of his time at M-Unit. *Id.* Nelson testified that he "had the authority to authorize or deny bed moves in the M-Unit but he did not personally" conduct them. *Id.* Prison records showed that he was the authorizing officer for several of Wright's bed moves. *Id.*

Wright began filing grievances against Nelson for the constant bed moves. *Id.* Nelson testified that "he would not know about grievances filed against him." *Id.* He then, however, acknowledged that the prison's grievance coordinator emailed him asking for a response to Wright's grievances, and Nelson responded to this email, proving the opposite. *Id.* Wright also complained to Nelson in-person. *Id.* Nelson told him, "If I was you, I would stop always bitching and complaining about bed moves, or I promise you, I will make your stay here a living hell." *Id.* Nelson denied making the statement in court but a third party confirmed that Nelson did so and the court credited the witness. *Id.* at 3-4.

Staff moved Wright to a cell with a cellmate he got along with on January 13, 2021. *Id.* at 4. When the grievance administrator emailed Nelson about Wright's complaints about bed moves, Nelson responded, "[Wright] and his cellmate have requested to live together and meet compatibility requirements" and therefore there should be "no reason for future complaints." *Id.*

In April, however, Nelson approved Wright to move once again, this time to share a cell with prisoner "Dorsey." *Id.* "Dorsey had been in several fights since his

arrival at NCCF and was held in M-Unit pending charges for murdering an Indianapolis police officer." *Id.* Wright told the officer moving him that he feared for his safety. *Id.* The officer placed Wright in the shower and wrote a case note explaining that Wright was refusing the housing assignment. *Id.* Records document that Wright told the officer that "he was in fear of his life being moved into" the cell. *Id.* Lt. Krul visited Wright in the shower, and Wright explained the situation to him. *Id.* Lt. Krul threatened to issue a conduct report and send Wright to segregation if he refused to move into the cell with Dorsey. *Id.* Wright accepted the assignment but then "after shift change, pressed the emergency panic button in the cell." *Id.* He told the arriving officer of his concerns, who agreed to move him without issuing him a disciplinary ticket. *Id.*

Wright was comfortable in this new housing assignment. *Id.* at 5. He told Nelson during this period that "he did not want to be moved back near Dorsey because he felt in danger." *Id.*

On June 1, Nelson again authorized Wright to move close to Dorsey, two cells away from him on the same recreation line. *Id.* Prisoners on the same recreation line interact with each other every day. *Id.* They go to recreation activities at the same time and use the same showers, microwave, and telephone. *Id.* There are eight recreation lines on the M-Unit. *Id.*

The day after Nelson moved Wright next to Dorsey, Dorsey punched him. *Id.* The ensuing fight lated 37 minutes with no intervention from staff. *Id.* After the fight, staff took Wright to medical which found that he "had abrasions on his foot, forearm, and face," was sore from being punched, and had a torn ligament in his wrist. *Id.* Wright suffers from post-traumatic stress disorder for which he receives medication and monthly therapy. *Id.* He cannot work certain jobs because of this mental health code. *Id.* Since the incident, "Wright has experienced night terrors, cold sweats, and is always on edge and in fear of being attacked." *Id.* at 5–6. Before the incident, Wright had been free of prison discipline for years. *Id.* at 6.

2) The Brooks assault

Prison staff took Wright to segregation after the fight. *Id.* They placed him next to the prisoner "Brooks." *Id.* Staff knew Brooks was combative, and although Wright was a protective custody prisoner Brooks was in general population. *Id.*

Brooks learned Wright was in protective custody and began threatening and harassing him as a "snitch." *Id.* Wright told Lt. Krul, Captain Gard, Sgt. Lee, and Nelson that Brooks was threatening and harassing him when they made their rounds. *Id.* They did nothing. *Id.* Because the two were in segregation, Brooks could hear Wright requesting a move because of Brooks's threats which only made Brooks more hostile. *Id.* at 7. In front of Sergeant Lee, Brooks threatened to stab Wright. *Id.*

The cells in segregation are solid with a window and a food slot, also known as a "cuff port." *Id.* On June 24, 2021, Brooks held his cuff port open and refused to let staff close it. *Id.* This violates the prison's rules and staff are supposed to stop prisoner movement around the cell and use a shield to cover the door. *Id.* Staff did neither. *Id.* When Officer Foley escorted Wright to his shower in shackles, Brooks threw "bodily fluids" on Wright. *Id.* Wright asked if he could shower to get the fluids off of him and prison staff said no. *Id.* Staff returned him to his cell where he sat with Brooks's fluids on him for three days. *Id.*

3) Retaliation

On June 8, 2021, Wright filed a grievance against Nelson, saying that he placed him in harm's way by placing him next to Dorsey. *Id.* On June 16, Wright was sentenced to time served in segregation, "meaning that he should have been released from segregation that day." *Id.* But he was held an additional thirteen days. *Id.*

The prison has a Restrictive Housing Unit Multi-Disciplinary Review Committee. *Id.* Notes from Nelson, a member of this committee, describe a June 16 meeting in which Wright was kept in segregation under a hold, suggesting it was because he had "been recommended to be removed from protective custody status." *Id.* A note from the following week, also by Nelson, said that he will remain on protective custody status and be released into general population. *Id.* The notes do

not explain the relationship between a review of protective custody status (which exists both inside and outside segregation) and keeping him in segregation past his time-served date. *Id.*

*b) Procedural history*

The court conducted a one-day trial on February 17, 2026. At the conclusion of the case in chief and defense, the court decided it would not hold closing arguments. R. 129 at 335. The court told Wright it would provide him a copy of the trial transcript by March 2. *Id.* at 334. The findings of fact and conclusions of law would be due two weeks later, on March 16. *Id.* Wright reminded the court that the "Westville mail system is tremendously slow" and asked the court to account for that in setting deadlines. *Id.* at 334–35. The court said "if you don't get it, file something." *Id.* at 335. Wright asked whether the proposed findings of fact and conclusions of law would constitute his closing argument, and the court said yes. *Id.* The court told Wright again, "if you have some delays, file something." *Id.*

On March 9, Wright sent a motion for enlargement of time, explaining that he still had not received the transcript. R. 133 at 2. The prison mailed the motion nine days later, *Id.* at 5, and the court received and docketed it two days afterwards on March 20, *id.* On March 27, the court denied the motion, writing that it was "able issue [sic] its Findings of Fact, Conclusions of Law and Order, based on the record of these proceedings, and Mr. Wright's submission is unnecessary." R. 135 at 1. The

court issued its conclusions of law and findings of fact on March 30, 2026. R. 136. Both parties timely appealed. R. 138; R. 143.

## SUMMARY OF THE ARGUMENT

Defendants' challenges to the liability findings depend on disregarding the district court's credibility determinations and reweighing the trial evidence. The court credited Wright's testimony, discredited Defendants' witnesses, and identified documentary evidence supporting Wright's account. Those findings support liability for the Dorsey and Brooks incidents and for Nelson's retaliatory placement of Wright near Dorsey. Defendants also misconstrue the difficulty of meeting the Eighth Amendment and Wright's evidence could satisfy it in any event.

The district court's compensatory damages award rests on an incorrect legal framework. The district court used standards governing appellate review of excessive jury verdicts to determine damages in the first instance, without explaining how the evidence produced the amounts awarded. Its only comparator involved a negligence claim against the United States, not deliberate indifference by correctional officers. Wright did not forfeit the issue because the court denied him the promised opportunity to submit a closing argument addressing damages.

The punitive damages ruling likewise requires reconsideration. The district court treated deliberate indifference as insufficient to establish the reckless disregard required for punitive damages, although the two standards are the same. As to

Nelson, the court found conduct satisfying the governing standard but denied punitive damages without explaining why. The punitive damages determination should therefore be vacated and reconsidered under the correct standard.

Finally, the judgment for Nelson on Wright's prolonged-segregation retaliation claim rests on testimony Nelson did not give. Nelson could not recall why Wright remained in segregation, and the committee notes do not establish a nonretaliatory reason for the additional thirteen days. Wright established a prima facie case, shifting the burden to Nelson, but Defendants presented no evidence that the same action would have occurred absent Wright's grievances. The Court should enter judgment for Wright on that claim.

## ARGUMENT

### I. This Court Should Reject Defendants' Challenges to the District Court's Order.

Defendants challenge the district court's rulings in Wright's favor on several grounds. The arguments all share the same flaw: they ignore the credibility determinations made at trial. The court ruled that "Defendants Nelson, Sgt. Lee, and Captain Gard, appeared to be woefully unprepared." R. 136 at 9. "Each repeatedly testified" that they had no memory of the incidents at issue in this case "despite the existence of exhibits and reports which could have refreshed their memories concerning the claims against them." *Id.* This case presented "numerous disputes in the testimonies of witnesses" which "present[ed] straightforward credibility

questions for the Court to resolve as the finder of fact." *Id.* Both the failure of Defendants' witnesses to recall the incidents of this case and their "demeanor at trial … diminished their credibility." *Id.* The court ruled against Defendants not because of a difference of opinion on the governing law but because it credited Wright's testimony and not theirs.

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "[E]ven greater deference to the trial court's findings" is required when "findings are based on determinations regarding the credibility of witnesses" because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.*; *see also Mucha v. King*, 792 F.2d 602, 605–06 (7th Cir. 1986) (explaining that "the main reason for appellate deference to the findings of fact made by the trial court" is that an appellate court's "main responsibility is to maintain the uniformity and coherence of the law, a responsibility not engaged if the only question is the legal significance of a particular and nonrecurring set of historical events").

Defendants do not explain on appeal why this is the rare case in which an appellate court should reject the trial court's credibility determinations. They do not cite any cases in which this Court has done so. Instead, they largely ignore the court's credibility determinations and ask this Court to reweigh the evidence as if they did not exist. As *Anderson* explained, such reweighing from first principles is not the role of an appellate court reviewing a trial court's factfinding. While it is possible for extrinsic evidence or inconsistency to so undermine credibility determinations that they are vulnerable to appellate review, Defendants have not even tried to argue that that is the case here.

As to the Dorsey assault on Wright, Defendants argue that "Shane Nelson was never shown to have direct knowledge of any threat by Inmate Dorsey." Op. Br. 9. The district court, however, explicitly credited "Wright's testimony that he told Nelson that he did not want to be around Dorsey" and declined to credit Nelson's testimony that he did not recall such a conversation. R. 136 at 11. The court found it undisputed that staff knew that Dorsey was violent. *Id.* The court therefore found that "Nelson knew that Wright was at risk of assault from Dorsey but disregarded that risk." *Id.*

Defendants also argue that "Nelson had access to an April 5, 2021 entry in which it was noted that Mr. Wright told Officer Foley that he was in fear for his life being moved into cell Ml-116 with Offender Dorsey" but "Nelson does not recall

reading the note." Op. Br. 9. As the district court explained, however, Nelson repeatedly testified that he failed to remember basic information about this case, with the district court finding his testimony uncredible as a result. R. 136 at 9. Defendants cannot use Nelson's inability to remember in their favor when the court held the opposite as a credibility determination.

The district court also did not err in ruling for Wright on his First Amendment retaliation claim arising from Nelson placing him in a cell near Dorsey, who then attacked him. R. 136 at 13. "To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable trier of fact to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action." *Id.* at 12. Defendants concede that Wright engaged in protected activity but argue that he had not shown an "adverse action" from Nelson, the test's second prong. Op. Br. 10.

Defendants do not articulate any legal error in the district court's conclusions of law on retaliation. Instead, they write that "Shane Nelson never performed any action that would be considered adverse to the plaintiff" as "the evidence supports only a finding that the plaintiff was a constant complainer." Op. Br. 10. This is a strange argument to make. It is uncontested that Wright told staff he was in fear of

Dorsey; that Nelson approved Wright's move next to Dorsey anyway; and the very next day Dorsey beat him badly, resulting in abrasions and a torn ligament. R. 136 at 5. His fears of Dorsey were plainly legitimate and not the result of being a "constant complainer." The court also "credit[ed] the testimony that sometime before this placement, Nelson told Wright that if he did not quit complaining he would make his 'stay a living hell.'" *Id.* at 13. That credibility determination supported the finding that "placing Wright near Dorsey when Wright was afraid of him could deter a person of ordinary firmness from participating in First Amendment activity." *Id.* Even if a factfinder could have found Wright uncredible, this one did not. Defendants offer no legal reason why the court's conclusion was wrong; they simply disagree.

The court was also correct to find that "Defendants were aware of a serious risk to Wright" from Brooks "and disregarded it in violation of his Eighth Amendment rights." R. 136 at 12. The court "credit[ed] Wright's testimony that he told each of the Defendants that Brooks had threatened him." *Id.* Defendant Gard testified that Brooks would often hold his cuff port hostage, leaving other people on his segregation unit at risk. *Id.* The court credited that Sergeant Lee observed these threats at least once. *Id.* The court then found that: "(1) Brooks was known to be combative and to make threats against Wright; (2) Wright told the Defendants about

these threats; and (3) Brooks held his cuff port open and Sgt. Lee and Captain Gard did not secure the cuff port before Wright was escorted to the shower." *Id.*

Defendants now argue that Captain Gard and Sergeant Lee were not present when Brooks held his food slot "hostage." Op. Br. 12. They cite no record authority for this conclusion. *Id.* Wright's testimony explained, to the contrary, that each defendant personally came to Brooks's cell. R. 129 at 286–88. The district court adopted this testimony, finding that Lee and Gard spoke to Brooks but did not secure the cuff port or put up a shield. R. 136 at 7. Gard himself testified that he never took any steps whenever a prisoner held his slot "hostage" despite prison policy to the contrary. R. 129 at 32–33; 53. Gard also testified that Brooks "had a habit" of holding the food slot hostage but had no memory of the day in question. *Id.* at 35, 43.

Defendants argue, big picture, that the district court erred in basing its findings more on "the plaintiffs allegations rather than the factual evidence presented at trial." Op. Br. 11. There are two problems with their argument. First, Wright's testimony *was* "factual evidence presented at trial." *See Khouri v. Highland Park CVS, LLC*, 178 F.4th 391, 401 (7th Cir. 2026) (explaining that the mere labeling of testimony as self-serving does not undermine a district court's finding it is credible). Second, if Defendants are referring to non-testimonial evidence as "factual evidence," prison records did more to support Wright's testimony than to undermine it.

Documentation, written by a non-party, explains that Wright "was in fear of his life" being moved next to Dorsey. R. 136 at 4. Bed-move records for the incidents at issue show Nelson as the authorizing officer. *Id.* at 3. Wright filed a grievance immediately after the Dorsey assault alleging Nelson put him in harm's way. *Id.* at 8. He also filed a grievance immediately after the Brooks incident requesting the security footage, which the grievance response said that it would preserve. *Id.* at 7–8. The prison's records both state that he should have been released from segregation on June 16 and that he was kept until June 29 with Nelson on the committee purportedly deciding. *Id.* at 8.

Although Defendants' core failure is their treatment of the record, they also err in describing Eighth Amendment law. They cite to *Gevas v. McLaughlin*, 798 F.3d 475, 480–81 (7th Cir. 2015), for the standard that Defendants can be liable "for failing to protect an inmate *only if* they have actual knowledge of a specific, credible, and imminent risk of serious harm." Op. Br. 13 (emphasis in original). That standard does not appear in *Gevas*. This Court held there that a plaintiff who has communicated a "specific, credible, and imminent risk of serious harm and identifies the prospective assailant" will typically be able to establish an Eighth Amendment claim but did not hold it was necessary. Furthermore, the court here found that Wright *did* convey a specific, credible, and imminent threat, identifying both specific

assailants to Defendants. *Gevas* ruled for the plaintiff on that basis, and this Court should too.

## II. The District Court Applied the Incorrect Law on Compensatory Damages and Undercompensated Wright as a Result.

"When a federal judge is the trier of fact, he, unlike a jury, is required to explain the grounds of his decision." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008). Federal Rule of Civil Procedure 52(a) requires that judges operating as factfinders explain their decisions, and this extends to damages. *Id.* Judges as factfinders must indicate the reasoning process that connects evidence to conclusion. *Id.* This Court has sympathized with judges who struggle to make this link in cases in which damages are difficult to define with any specificity while explaining that, nonetheless, "figures … plucked out of the air" violate the requirement for "reasoned, articulate adjudication imposed by Rule 52(a)." *Id.*

The district court began its discussion of damages by writing that "[i]n considering damages, the Seventh Circuit Court of Appeals has held that three factors guide its analysis: whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." R. 136 at 14 (quoting *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (cleaned up)). This statement of law is straightforwardly wrong. As is plain from their content,

the *Adams* factors are not meant to help a factfinder determine what amount of damages is appropriate but instead to decide whether a damages award is *excessive* in remittitur cases, in which parties challenge jury verdicts as too high. The *Adams* factors ask the court to consider whether an award is excessive (but not too low) and whether a jury (but not a court) has engaged in "fevered imaginings, or personal vendettas." *Id.* Applying factors for determining a cap of damages is not an adequate way to reason to the correct quantity.

The court then turned to this Court's opinion in *Hendrickson v. Cooper*, 589 F.3d 887 (7th Cir. 2009). *Hendrickson* too is a judicial review of a jury's damages award for excessiveness, not a prescription for how to determine damages in the first instance. Indeed, the court's quotation from *Hendrickson* required it to replace "jury" with "[trier of fact]" in brackets because the legal principles apply only to judicial review of a jury verdict, not a court operating as a factfinder.

The district court's obligation was in determining what amount of damages would compensate Wright for the harm he suffered. *See Carey v. Piphus*, 435 U.S. 247, 255 (1978). If it found the harms here too abstract to reasonably quantify, the court should have "consider[ed] awards in similar cases, both in [Indiana] and elsewhere." *Arpin*, 521 F.3d at 776 (7th Cir. 2008). The court failed to do so. It cited a single case, "*Dake v. United States*, 1:13-cv-961 TWP-DML [sic]," and erred in its description of it. The plaintiff in *Drake* (not "*Dake*") did obtain 10,000 dollars in

damages. The case did not involve, however, "defendant correction officers" nor a finding that any party was "deliberately indifferent." R. 136 at 14–15. As is plain from the title of the case, *Drake* was brought not against correctional officers but against the United States pursuant to the Federal Tort Claims Act. Rather than a heightened deliberate indifference standard, Drake needed only prove that the United States was negligent in providing him a bed with a sharp edge. The court supplied no comparisons for its $1,000 award for letting Wright have bodily fluids thrown on him and sitting in them for three days. And the court awarded no damages at all for First Amendment retaliation despite finding Nelson liable.

Wright has not forfeited the argument that he is entitled to more than $7,000 in damages. The court suggested as much when it wrote, "Neither party presented any argument or authority concerning a dollar amount for damages." R. 136 at 14. That is wrong in multiple ways. As defendants often do, Defendants did argue for a dollar amount of damages: zero.

Wright lacked the opportunity to make a proper damages argument. At the conclusion of the case in chief and defense, the court decided it would not hold closing arguments but would instead hear closing arguments via written submissions. R. 129 at 335. The court told Wright it would provide him a copy of the trial transcript by March 2. *Id.* at 334. The findings of fact and conclusions of law would be due two weeks later, on March 16. *Id.* Wright reminded the court that

the "Westville mail system is tremendously slow" and asked the court to account for that in setting deadlines. *Id.* at 334–35. The court said "if you don't get it, file something." *Id.* at 335. The court told Wright again, "if you have some delays, file something." *Id.*

On March 9, Wright sent a motion for enlargement of time, explaining that he still had not received the transcript. R. 133 at 2. The prison mailed the motion nine days later, *id.* at 5, and the court received and docketed it two days afterwards on March 20, *id.* On March 27, the court denied the motion, writing that it was "able issue [sic] its Findings of Fact, Conclusions of Law and Order, based on the record of these proceedings, and Mr. Wright's submission is unnecessary." R. 135 at 1. The court issued its conclusions of law and findings of fact on March 30, 2026. R. 136.

Closing argument is typically when a party makes damages arguments. *See, e.g.*, *Bolden v. Pesavento*, 158 F.4th 879, 882 (7th Cir. 2025); *Farnik v. City of Chicago*, 1 F.4th 535, 540 (7th Cir. 2021); *Gavoni v. Dobbs House, Inc.*, 164 F.3d 1071, 1074 (7th Cir. 1999). The court knowingly deprived Wright of the ability to have a closing argument. It then cited the incorrect law and a single, inapposite case unmentioned at trial or by any of the parties in providing Wright damages. Wright never had the opportunity to provide damages argument and therefore has not lost

his license to challenge the district court's errors now.[1] This Court should vacate and remand for the district court to enter a damages award consistent with Federal Rule of Civil Procedure 52(a).

## III. The District Court Erred in Failing to Provide Punitive Damages Based on Legal Errors.

Punitive damages are left to the discretion of the factfinder. *Smith v. Wade*, 461 U.S. 30, 52 (1983). As described in Section II, however, when courts act as factfinders, they must provide reasoned bases for their decisions pursuant to Federal Rule of Civil Procedure 52(a). They must also apply the correct law in exercising their discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996). The district court did neither.

The court stated the law on punitive damages correctly. First, it wrote that punitive damages "are appropriate only if the defendants' conduct was malicious or in reckless disregard of Wright's rights." R. 136 at 15. It elaborated, first, that

[1] The district court caused an undercount of Wright's damages in one other key respect. Wright attempted to introduce medical records documenting the mental health consequences of the incidents at issue in the trial. R. 129 at 263–65. The district court entertained objections to the evidence and steered Wright's testimony towards his personal experience, telling him "in case your records don't get in, tell me what's going on." R. 129 at 264. When Defendants conceded the admissibility of the records in their post-trial brief, the court admitted the records into evidence but "[n]otwithstanding this admission" "relie[d] largely on Wright's testimony regarding his mental and physical disabilities." R. 136 at 5–6 n.4. The court's admission yet explicit disregard of medical evidence of post-traumatic stress disorder and other mental health consequences may help explain the low damages figure.

conduct "is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring Wright" and, second, "in reckless disregard of Wright's rights if, under the circumstances, a defendant simply did not care about Wright's safety." *Id.*

The court then erred in its application of this law to the findings of fact and conclusions of law it had just made. In its only analysis of punitive damages as to the Brooks assault, the court wrote that "Wright did not show that Defendants Sgt. Lee, Captain Gard, and Lt. Krul acted maliciously or with more than deliberate indifference to warrant punitive damages." *Id.* By holding that Wright's showing was inadequate as a matter of law, the court thereby ruled that Wright was ineligible for punitive damages because he demonstrated only "deliberate indifference," the merits standard here, and not "reckless disregard." This was a plain legal error. The reckless disregard from punitive damages and the deliberate indifference standard from the Eighth Amendment are identical. *See Smith v. Wade*, 461 U.S. 30, 56 (1983). While the court had the discretion to provide punitive damages or not, being merely deliberately indifferent did not categorically disqualify them from consideration as the district court held. *Id.*

The following sentence then rejected punitive damages against Nelson: "Although the Court found that Nelson threatened to make Wright's life difficult, the Court nonetheless finds that punitive damages are not warranted against him."

R. 136 at 15. Here, the court has conceded that Nelson met the standard for punitive damages but found that, "nonetheless," they were not warranted without a word of explanation why. The court had discretion to determine whether to provide punitive damages or not, but it was still obligated to explain the basis for its decision pursuant to Federal Rule of Civil Procedure 52(a).

To be clear, Wright is not entitled to punitive damages as a pure question of law; the question must go to a factfinder. *Smith*, 461 U.S. at 52. That does not mean, however, that a court may commit legal error in refusing to provide punitive damages. Nor may the court entirely fail to explain the basis for its decision. This Court should vacate the district court's failure to assess punitive damages and remand for the district court to analyze the issue anew.

## IV. The District Court Erred in Granting Judgment to Nelson on Wright's Retaliation Claim for Being Kept in Segregation.

The district court ruled for Nelson on Wright's First Amendment retaliation claim for being inappropriately held in segregation. R. 136 at 13. It did so with a single sentence of analysis, writing that "the Court credits Nelson's testimony that this decision was made by the entire RHU Multi-Disciplinary Review Committee and was based on their review of Wright's protective custody status, not retaliatory reasons." *Id.* There are two errors in this conclusion, one in the record and one legal.

Most importantly, the court erred by purportedly crediting Nelson's testimony that the committee's decision "was based on their review of Wright's protective

custody status." Nelson never testified to this. There was therefore nothing to credit. The district court cited to two portions of the transcript to support its conclusion. *Id.* Neither does. First, when asked whether Wright's prolonged stay in segregation was clerical, Nelson testified no and elaborated that "[b]ased off the notes," Wright was "under review to remove the protective custody." R. 129 at 182. Nelson was giving his interpretation of the committee notes, not what he remembered from actually being on the committee. Second, when asked if he had any say in whether Wright was held in segregation, Nelson testified that he "would have been part of the committee to decide for him to remain in the segregation unit." *Id.* at 295. Both portions of testimony are banal: Nelson was part of the committee that kept Wright in segregation and the meeting notes describe a review of Wright's protective custody status. As to the latter, there is no clear relationship between the review of Wright's status and being kept in segregation, as he was ultimately kept on protective custody and released to general population. Neither describes the actual motivation of Nelson or the committee or why Wright was not released from segregation on June 16 when he was sentenced to time served and should have been. R. 136 at 8.

A broader view of the record demonstrates that Nelson's testimony writ large is irreconcilable with the court's conclusion. Nelson was explicitly asked whether he was the one who "initiate[d] Mr. Wright being held on segregation past his out date" and he testified that he did not remember. R. 129 at 169. When asked whether

he "recommended" that Wright "be held in seg longer," he testified that he "wouldn't know" because he did not remember. *Id.* at 170. When asked about the conflict between the June 16 and June 23 committee decisions, Nelson testified twice that he did not recall "why the decision changed." *Id.* at 172. When asked who made the ultimate decision to remove Wright from segregation, Nelson testified that he did not remember. *Id.* at 194.

When Nelson was asked directly whether he had retaliated against Wright, he did testify, conclusorily, that he did not. *Id.* But Nelson did not remember any of the decisions of the committee or why they were made. He cannot testify that he had pure motivations as to an event that he does not remember.

As described above in Section I, credibility determinations are largely unassailable on appeal. This does not permit, however, district courts to "insulate [their] findings from review by denominating them credibility determinations." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). Nelson simply did not testify that the decision to hold Wright in segregation "was made by the entire RHU Multi-Disciplinary Review Committee and was based on their review of Wright's protective custody status" R. 136 at 13. The district court was therefore wrong to conclude that it did.

Even if this Court were to hold that the district court's holding was properly deemed a "credibility determination," the rare circumstance when appellate

intervention is appropriate is when the court is "internally inconsistent." *Anderson*, 470 U.S. at 575. Here the district court found that Nelson was not credible due to his "demeanor" and being "woefully unprepared," repeatedly testifying that he remembered nothing "despite the existence of exhibits and reports which could have refreshed" his memory. R. 136 at 9. The events around Wright being held in prolonged segregation is the defining example of this evasiveness. Documentary evidence confirmed that Wright was held in segregation past his release date, and the only objective evidence about the purported reason consists of notes that Nelson wrote himself. Yet Nelson testified that he had no memory of the basis of the decision, including that he did not remember whether he was personally responsible for the hold.

Courts are certainly permitted to deem some parts of a witness's testimony credible and others not. But that is not what happened here. Nelson refused to familiarize himself with any information about the case, testified that he remembered nothing, and the district court appropriately found his testimony uncredible as a result. The court then inconsistently applied this finding to make inferences in Nelson's favor as to an event that only he could explain.

With the district court's basis for its decision undermined, this Court should enter judgment for Wright. This Court has described the burden-shifting involved in a prisoner's First Amendment retaliation case. *Manuel v. Nalley*, 966 F.3d 678, 680

(7th Cir. 2020). First a plaintiff must establish a prima facie case: protected speech or activity; a deprivation to deter the protected conduct; motivated at least in part by the conduct. *Id.* Then "the burden shifts to the defendant to rebut the claim, that the activity would have occurred regardless of the protected activity." *Id.* If the defendant can do so, the plaintiff "must demonstrate the proffered reason is pretextual or dishonest." *Id.*

Wright put forth a prima facie case. It is undisputed that Wright's conduct was protected. R. 136 at 13. Objective evidence shows that staff held him in solitary confinement for thirteen days after he was ordered released, an adverse action. Nelson, the committee member who documented the decision, did so days after Wright filed a grievance against him, permitting the inference that Nelson did so for purposes of retaliation. Making the inference plainer, Nelson did so just weeks after Nelson had retaliated against Wright by placing him next to Dorsey, as the district court held. R. 136 at 13. This shifted the burden to Nelson.

Nelson failed at step two. The burden shifted to him to demonstrate that Wright would have been held in prolonged segregation even if he had not filed grievances against Nelson. Defendants could have had Nelson or any other member of the committee testify as to the actual motivation of the committee in holding Wright the additional thirteen days. This testimony would have created ambiguities that would have shifted the burden back to Wright and ultimately left the decision

for the factfinder. They did not do so. Nelson remembered nothing of the event and Defendants put on no other evidence to meet their burden and shift the burden back to Wright, making judgment for Wright appropriate.

## CONCLUSION

This Court should affirm the district court's judgment ruling for Wright; reverse the court's entry of judgment for Nelson on Wright's First Amendment retaliation claim; and vacate the compensatory and punitive damages findings and remand for further proceedings.

Date: August 28, 2026.

*<u>/s/ Samuel Weiss</u>*

Samuel Weiss
RIGHTS BEHIND BARS
1800 M Street NW, Front 1
#33821
Washington, DC 20033
(202) 455-4399
sam@rightsbehindbars.org

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: August 28, 2026

*/s/ Samuel Weiss*
Samuel Weiss

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7), I certify that:

The undersigned counsel of record for the Plaintiff-Appellee, Carlton Wright, furnishes the following in compliance of Fed. R. App. P. 32(a)(7) because this brief contains 6,364 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

I further certify that the appendix and short appendix from Appellant includes all of the materials required by Cir. R. 30(a) and (b).

Date: August 28, 2026

*/s/ Samuel Weiss*
Samuel Weiss